**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |
|---|---|
| **UNITED STATES SECURITIES**<br>**AND EXCHANGE COMMISSION,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| v. | ) Civil Action No.  16-cv-9829 (  ) |
| **NAVNOOR S. KANG, GREGG Z.**<br>**SCHONHORN, and DEBORAH**<br>**D. KELLEY,** | ) ) ) ) ) |
| **Defendants.** | ) ) ) |

_____ )

## COMPLAINT

The United States Securities and Exchange Commission alleges as follows:

### Nature of the Action

1.     This action concerns the former Director of Fixed Income for the New York State

Common Retirement Fund (the "NYSCRF" or the "Fund"), who demanded and received at least

$180,000 in undisclosed and improper benefits, entertainment, and travel from registered

representatives of broker-dealers in exchange for directing public pension trades to the broker-

dealers.  This "pay-to-play" arrangement netted the registered representatives millions of dollars

in trading commissions.

2.     In early 2014, the NYSCRF, the third largest public pension fund in the United

States, hired Defendant Navnoor S. Kang to be its Director of Fixed Income, giving him

investment responsibility for approximately $50 billion of the Fund's assets.

3.     As soon as Kang arrived at the NYSCRF, he engaged in improper and illegal

behavior by soliciting and receiving items of value from Defendant Gregg Z. Schonhorn, a

registered representative of a broker-dealer headquartered in Memphis, Tennessee ("Broker-

Dealer 1").

4.       During the course of Defendant Kang's two-year employment at the NYSCRF, he solicited, and Schonhorn provided, the equivalent of at least $160,000, including:  expensive dinners, alcohol and bar "bottle service," entertainment at strip clubs, hotel stays, airfare, tickets to concerts and sporting events, a $17,000 wristwatch, cash, and tens of thousands of dollars in cocaine and services from prostitutes.  None of these benefits were disclosed to the Fund.

5.       In exchange for these substantial personal benefits, Defendant Kang directed a significant portion of the NYSCRF's trading volume to Broker-Dealer 1 for execution.

6.       At the time of Defendant Kang's arrival at the NYSCRF in January 2014, Broker-Dealer 1 was not executing trades on behalf of the Fund.  Within three months of Defendant Kang's arrival, Defendant Kang was directing trades to Broker-Dealer 1 through one of the Fund's approved brokers and, by November 2014, Defendant Kang had secured Broker-Dealer 1 a place on the Fund's approved broker list.  By April 2015, Broker-Dealer 1 had executed at least $1.5 million in fixed income securities trades.  Thereafter, the increase in business directed to Broker-Dealer 1 was substantial.  By the end of the NYSCRF's fiscal year on March 31, 2016, Broker-Dealer 1 had executed approximately $2.38 billion in fixed income securities trades.

7.       As a result, Defendant Schonhorn received sizable commissions – often hundreds of thousands of dollars per month.

8.       Defendant Kang also solicited and received improper benefits and entertainment from Defendant Deborah D. Kelley, formerly a registered representative of a broker-dealer headquartered in Birmingham, Alabama ("Broker-Dealer 2").

9.       During the course of Defendant Kang's employment at the NYSCRF, Defendant Kelley spent nearly $20,000 in concert tickets, meals, and hotel stays for the benefit of

Defendant Kang.  Defendant Kelley expensed these items through Broker-Dealer 2 but, as previously planned with Defendant Kang, intentionally omitted Defendant Kang's name from her expense reports.  Further, none of these benefits were disclosed to the Fund.

10.     As with Defendant Schonhorn, in exchange for these benefits, Defendant Kang secured Broker-Dealer 2 a place on the NYSCRF's approved broker list.

11.     At the time of Defendant Kang's arrival at the NYSCRF, Broker-Dealer 2 was not executing trades on behalf of the Fund.  By the time Defendant Kang left, Broker-Dealer 2 (and its successor broker-dealer) had executed nearly $1 billion in fixed income securities trades on behalf of the Fund.  As a result of her business relationship with the Fund, Defendant Kelley received sizable commissions.

12.     Defendant Kang, as a fiduciary to the NYSCRF, had a duty to disclose to the NYSCRF his solicitation and receipt of benefits from Defendants Schonhorn and Kelley in connection with the securities trades their firms executed on behalf of the NYSCRF.  No such disclosure was made.

13.     Based on conversations Defendants Schonhorn and Kelley had with Defendant Kang, Defendants Schonhorn and Kelley knew that Defendant Kang was prohibited from accepting the meals, travel, and entertainment they provided to him, and that he was not disclosing the receipt of these benefits to the Fund.  Defendants Schonhorn and Kelley, in fact, took steps to keep the benefits a secret.

14.     Defendant Kang, in soliciting and receiving the benefits without any disclosure, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)].  Defendants Schonhorn and Kelley

participated in the fraudulent scheme to keep the benefits a secret, and therefore also violated

Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Rules 10b-5(a) and (c) thereunder [17

C.F.R. §§ 240.10b-5(a) and (c)], and Sections 17(a)(1) and (a)(2) of the Securities Act [15

U.S.C. §§ 77q(a)(1) and (3)].  In addition, Defendants Schonhorn and Kelley knowingly

provided substantial assistance to Defendant Kang in keeping the benefits a secret from the

NYSCRF, and therefore aided and abetted Defendant Kang's violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b) ], Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and

Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

15.    Unless Defendants are permanently restrained and enjoined, they will again

engage in the acts, practices, transactions, and courses of business set forth in this Complaint,

and in acts, practices, transactions, and courses of business of similar type and object.

**Jurisdiction and Venue**

16.    The Commission brings this action pursuant to the authority conferred by Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(1) of the Exchange Act [15

U.S.C. § 78u(d)(1)], seeking to restrain and enjoin permanently defendants from engaging in the

acts, practices, transactions, and courses of business alleged herein.  The Commission also seeks

a final judgment ordering defendants to pay disgorgement, prejudgment interest, and civil

penalties pursuant to Section 20(d) of the Securities Act [at U.S.C. § 77t(d)] and Section 21(d)(3)

of the Exchange Act [15 U.S.C. § 78u(d)(3)].

17.    This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and

Sections 20(d) and 27(a) of the Exchange Act [15 U.S.C.  §§ 78t(d) and 78aa(a)].  Defendants,

directly or indirectly, singly or in concert, made use of the means or instruments of transportation

or communication in, and the means or instrumentalities of, interstate commerce, or of the mails

in connection with the acts, practices, transactions, and courses of business alleged herein.  Some

of the acts, practices, transactions, and courses of business at issue occurred in the Southern

District of New York.

### Defendants

18.    **Navnoor S. Kang**, age 37, resides in Portland, Oregon.  He is currently a Fixed

Income Portfolio Manager for an insurance and financial services company located in Portland.

From January 2014 through February 2016, Defendant Kang was the Director of Fixed Income

and Head Portfolio Strategist for the NYSCRF.

19.    **Gregg Z. Schonhorn**, age 44, resides in Short Hills, New Jersey.  Since June

2013, Schonhorn has been a registered representative and vice president in fixed income sales at

Broker-Dealer 1, which is headquartered in Memphis, Tennessee.

20.    **Deborah D. Kelley**, age 58, resides in Piedmont, California.  Kelley currently is a

registered representative of a registered broker-dealer.  From January 2012 through August 2015,

Kelley was a registered representative of Broker-Dealer 2, which was headquartered in

Birmingham, Alabama, and its successor broker-dealer based in St. Louis, Missouri.

### Other Relevant Entity

21.    **The New York State Common Retirement Fund** is the third largest public

pension fund in the United States.  It holds assets in excess of $175 billion that it manages for

two New York State retirement systems: the Employees' Retirement System and the Police and

Fire Retirement System.  The New York State Comptroller determines policies and manages the

investment operations of the NYSCRF.  The New York State Comptroller, and anyone to whom

he or she delegates powers of investment – such as Defendant Kang – is a fiduciary of the Fund.

New York state law mandates that such fiduciaries shall not receive any consideration from any party other than the Office of the State Comptroller in connection with a transaction involving the Fund.

## The Facts

22.     Defendant Kang met Defendant Schonhorn in or around 2010 in Las Vegas through a colleague of Defendant Schonhorn's who was entertaining Defendant Kang.

23.     At the time, Defendant Schonhorn was a fixed income trader with another broker-dealer, and Defendant Kang, who had previously spent three years as a portfolio associate with a well-known asset management firm ("Asset Manager 1"), was working as a vice president and fixed income trader with another prominent asset management firm ("Asset Manager 2").

24.     Defendant Kelley met Defendant Kang while he was employed by Asset Manager 1, and she had a business relationship with him for a period of time while he worked at Asset Manager 2.

25.     At some point in or around 2012, Defendant Kang accepted an $8,000 Rolex watch from Defendant Schonhorn, which Defendant Kang did not disclose to Asset Manager 2.

26.     An internal investigation by Asset Manager 2 in late 2012 into Defendant Kang's activities concluded that he had accepted Rolling Stones concert tickets valued at $1,200 from a registered representative of a broker-dealer doing business with Asset Manager 2. This registered representative was the same person who introduced Defendant Schonhorn to Defendant Kang.

27.     In addition, the investigation determined that Defendant Kang failed to report at least 54 additional instances where he received benefits and entertainment. Asset Manager 2 terminated Defendant Kang in January 2013 for violations of its compliance and ethics policies

6

based on his improper receipt of, and failure to report, these benefits and entertainment. Asset Manager 2 informed Defendant Kang that he was being terminated for these reasons.

28.     Between January 2013 and January 2014, Defendant Kang was unemployed and actively seeking work. Defendants Schonhorn and Kelley remained in contact with Defendant Kang, and both assisted him in his job search – all in an effort to maintain and cultivate their business relationship. Defendant Kelley provided a reference to the NYSCRF on Defendant Kang's behalf.

### Kang's Employment by and Duties to the NYSCRF

29.     In January 2014, the NYSCRF hired Defendant Kang as its Director of Fixed Income. During his job interview with the NYSCRF, Defendant Kang lied about the reason he was terminated by Asset Manager 2.

30.     As the Director of Fixed Income at the Fund, Defendant Kang made investment decisions, supervised seven investment officers, and was responsible for approximately $50 billion of the Fund's assets that were held in fixed-income securities.

31.     Under New York State Law, the New York State Comptroller, and anyone to whom he or she delegates powers of investment, is a fiduciary of the Fund. Because Defendant Kang was delegated powers of investment by the Comptroller, he was a fiduciary to the Fund. As a fiduciary, Kang was required to act solely in the interests of the members and beneficiaries of the Fund, and was prohibited from receiving any consideration from any party other than the Office of the State Comptroller in connection with a transaction involving the Fund.

32.     The NYSCRF maintains a "Code of Conduct" containing standards for the management of the Fund. The Code of Conduct applies to all employees of the Office of the State Comptroller who have responsibility for matters relating to the Fund. Among other things,

the Code of Conduct mandates that the Fund shall "be managed in accordance with the highest

ethical, professional and conflict of interest standards," and actions on behalf of the Fund "shall

be for the sole benefit of the Retirement System's members, retirees and beneficiaries."

33.     Defendant Kang received training on the Fund's policies and codes, as well as

applicable New York State Law, and certified as to his understanding of the prohibitions

contained therein regarding the receipt of gifts, meals, travel, and entertainment.

34.     Defendant Kang had an affirmative and continuing duty to disclose to the Fund

his solicitation and acceptance of travel, entertainment, and benefits.  Defendant Kang was

required to report the receipt of anything more than nominal value from interested parties.

35.     During his tenure with the Fund, Defendant Kang made no such disclosures.

Furthermore, Defendant Kang filed a certification with the Fund in which he represented that he

had received no gifts in excess of $1000.  This certification was false.

### Schonhorn and Kelley Corruptly Provide Benefits to Kang

36.     In February 2014, shortly after accepting the position with the NYSCRF,

Defendants Schonhorn and Kang went on a lavish trip to Montreal, at the suggestion of

Defendant Kang.  Defendant Schonhorn paid expenses for both himself and Defendant Kang,

which included more than $825 for airline tickets, approximately $720 for hotel rooms, $3,500

for meals and drinks, and cash for cocaine.

37.     In total, between February 23, 2014 and May 1, 2016, Defendant Schonhorn spent

approximately $160,000 on more than 100 separate transactions of benefits, travel, and

entertainment for the benefit of Defendant Kang, none of which was disclosed by Defendant

Kang to the NYSCRF.  Defendant Schonhorn did not expense these benefits to Broker-Dealer 1,

but rather paid for them out of his own pocket.

8

38.     A partial breakdown of the money spent by Defendant Schonhorn for the benefit of Defendant Kang includes:  more than $50,000 spent on hotel rooms in New York City, Montreal, Atlantic City, and Cleveland; approximately $25,000 spent at bars and lounges and on bottle service; approximately $25,000 spent at restaurants; a $17,400 Panerai watch purchased for Defendant Kang; and a $4,200 Hermes bracelet, which was purchased for Defendant Kang's girlfriend at Defendant Kang's request.

39.     Defendant Schonhorn provided these benefits to Defendant Kang for the purpose of obtaining lucrative NYSCRF business through Defendant Kang.

40.     Following Defendant Schonhorn's gift of the $17,400 Panerai watch to Defendant Kang, Defendant Schonhorn and Defendant Kang agreed that Defendant Schonhorn would continue entertaining Defendant Kang and providing him benefits so long as Defendant Kang funneled enough business to Broker-Dealer 1 to make it worthwhile for Defendant Schonhorn.

41.     Defendant Kelley provided thousands of dollars' worth of benefits and entertainment to Defendant Kang in exchange for access to NYSCRF business, despite the fact that her colleagues had warned her to avoid such behavior.

42.     Specifically, in a February 6, 2014 email (immediately prior to Defendant Kelley beginning her coverage of the NYSCRF account), another registered representative at Broker-Dealer 2 told Defendant Kelley to "remember these guys cannot be entertained as they are a state fund."

43.     Nevertheless, Defendant Kelley soon thereafter planned a trip to New Orleans for herself, her husband, Defendant Kang, and Defendant Kang's girlfriend, which took place in October 2014.

44.     On this trip, Defendant Kelley spent, and then expensed to Broker-Dealer 2, more

than $8,000 for the four of them on meals, drinks, and entertainment, including $6,000 for four VIP tickets to a Paul McCartney concert.

45.     Defendant Kelley intentionally omitted the names of Defendant Kang and his girlfriend from her expense reports, instead listing clients from a private firm.

46.     Four months later, in February 2015, Defendant Kelley planned a ski trip to Park City, Utah for herself, her husband, a co-worker, Defendant Kang, and Defendant Kang's girlfriend.  In particular, Defendant Kelley paid, and then expensed back to Broker-Dealer 2, expenses for Defendant Kang and Defendant Kang's girlfriend, which included more than $11,000 for limousine service, skiing, hotel rooms, dinners, and drinks.

47.     Once again, Defendant Kelley concealed from Broker-Dealer 2 the fact that Defendant Kang and his girlfriend were on the trip, listing other clients (and even some personal acquaintances not in the securities industry) on her expense reports.

48.     Defendant Kang did not disclose his receipt of any of these meals, travel, or entertainment to the NYSCRF.

### Kang Corruptly Rewards Schonhorn and Kelley with Lucrative Bond Trading Business

49.     In exchange for these benefits, Defendant Kang steered lucrative bond trading business for the NYSCRF to Broker-Dealers 1 and 2, resulting in substantial personal gain for Defendants Schonhorn and Kelley.

50.     When Defendant Kang first arrived at the NYSCRF, there were a very small number of brokers approved to execute fixed income trades directly for the Fund.

51.     Defendant Kang set out to expand the list of approved brokers under the guise of facilitating additional liquidity and obtaining best execution.

52.     On June 10, 2014, at Defendant Kang's direction, the Fund initiated a fixed

income broker search to select brokers for its internally managed assets.  Interested entities were required to submit applications, which were then reviewed internally by a group led by Defendant Kang.

53.     Defendants Schonhorn and Kelley submitted applications on behalf of Broker-Dealer 1 and Broker-Dealer 2, respectively.

54.     Several months later, on November 6, 2014, Defendant Kang sent a memorandum to the NYSCRF's CIO recommending that eight brokers be added to the approved list.  The recommended brokers included Broker-Dealer 1 and Broker-Dealer 2, and all eight brokers were approved.

55.     Although Defendant Kang indicated in his memorandum that the eight brokers would be required to submit to a "full due diligence process" conducted by an outside firm, no such process ever took place.  Accordingly, the eight brokers were approved based solely on the recommendation contained in Defendant Kang's November 6, 2014 memorandum.

56.     Prior to Broker-Dealer 1 and Broker-Dealer 2 becoming approved brokers, Defendant Kang was directing trades to both brokers through one of the Fund's approved brokers, "Broker-Dealer 3."

57.     By using Broker-Dealer 3, Defendant Kang circumvented the Fund's policy of only using approved brokers, thus allowing Defendant Kang to steer Fund business and commissions to Defendants Schonhorn's and Kelley's firms even before Defendant Kang was able to engineer the placement of those firms on the Fund's approved broker list.

58.     Defendant Kelley provided substantial personal benefits to Defendant Kang beginning shortly after the Fund solicited applications for additional brokers, as the timeline below illustrates:

| Date | Event |
|------|-------|
| June 10, 2014 | NYSCRF solicits applications for brokers via email. |
| August 15, 2014 | In an instant Bloomberg message between Defendants Kang and Kelley, Defendant Kang says he would like to see a Paul McCartney concert but "might have to sell a car to get [tickets]." Defendant Kang says he wants to see the concert in New Orleans. Defendant Kelley responds, "I'm in." |
| August 19, 2014 | Defendant Kelley purchases four Paul McCartney tickets at a price of $6,005. |
| October 9-13, 2014 | Defendant Kelley and her husband spend a weekend in New Orleans with Defendant Kang and Defendant Kang's girlfriend. Defendant Kelley expenses more than $8,000 in meals and entertainment. |
| November 6, 2014 | In a memorandum to CIO of NYSCRF, Defendant Kang recommends Broker-Dealer 2, Defendant Kelley's firm. |
| November 6, 2014 | Defendant Kang calls one of Defendant Kelley's colleagues at Broker-Dealer 2 and mentions going on a ski trip. |
| February 13-16, 2015 | Park City ski trip takes place. Defendant Kelley expenses more than $11,000 in meals, hotel rooms, ski equipment and rentals, limousine service, and entertainment. |

59.     Defendant Schonhorn similarly provided substantial personal benefits to Defendant Kang beginning shortly after the Fund solicited applications for additional brokers. Between the June 10, 2014 email from the NYSCRF soliciting applications for brokers and Defendant Kang's November 6, 2014 broker recommendation memorandum, Defendant Schonhorn spent more than $38,000 on dinners, drinks, concert and sports tickets, illicit drugs, and prostitutes for himself and Defendant Kang.

60.     Over the approximately two years that Defendant Kang worked at the NYSCRF, he directed a significant amount of trading to Broker-Dealers 1 and 2, resulting in substantial personal gain for Defendants Schonhorn and Kelley. Defendant Schonhorn, for example, often

received hundreds of thousands of dollars in monthly commissions.

**Kelley and Kang Continue Their Attempts to Keep the Scheme a Secret**

61.     On August 10, 2015, Broker-Dealer 2 terminated Defendant Kelley after conducting an internal investigation into her activities.  During the course of that investigation, Defendant Kelley repeatedly lied about the circumstances of the expenditures and who was present in Park City.  For example, Defendant Kelley falsely stated that the Park City hotel room used by Defendant Kang and his girlfriend was unoccupied during the ski trip, and that she did not pay for meals for Defendant Kang and his girlfriend.

62.     Starting on or around October 2015, Defendant Kang and Defendant Kelley agreed to tell the same false story about the ski trip to help cover up their activities in Park City.

63.     In her October 2015 response to a letter of inquiry from the Financial Industry Regulatory Authority, Inc. ("FINRA"), Defendant Kelley lied about the circumstances of the expenditures and who was present in Park City.

64.     On December 17, 2015, Defendant Kelley provided sworn testimony to the Commission, during which she perjured herself throughout.  As she had done during Broker-Dealer 2's internal investigation and in her response to FINRA, she repeatedly lied about the circumstances of the expenditures and who was present in Park City.  Consistent with her agreement with Defendant Kang, she testified that she only paid for some small expenses for Defendant Kang, and that Defendant Kang reimbursed her with cash and rounds of drinks.  In addition, Defendant Kelley never disclosed the existence of, or expenses associated with, the trip to New Orleans in spite of the Commission's inquiries as to whether there was any additional travel or expenses similar to the Park City trip.

65.     Both before and after her testimony, Defendants Kelley and Kang remained in

contact.  At some point in January 2016, Defendant Kang became aware that Defendant Kelley would not continue to lie about the Park City trip.  Within days, Defendant Kang made several attempts to contact his ex-girlfriend for assistance in covering up his activities.  She refused to take his calls.

66.     Defendant Kang then enlisted Defendant Schonhorn's help.  Defendant Kang asked Defendant Schonhorn if he knew anyone who could fabricate hotel receipts, in order to cover up the ski trip.  In addition, at Defendant Kang's request, Defendant Schonhorn called Defendant Kang's ex-girlfriend and asked her to send a $4,000 check to Defendant Kelley and to pretend as if she had simply forgotten to pay Defendant Kelley for their hotel room.  Defendant Kang's ex-girlfriend refused to do this.

67.     Thereafter, in late January 2016, nearly a year after the Park City trip and after failing to enlist the help of his ex-girlfriend to cover up the scheme, Defendant Kang had a colleague hand deliver a personal check to Defendant Kelley in the amount of $4,500.  The check arrived inside of a Christmas card containing a note written by Defendant Kang which falsely stated that "[i]t was just brought to my attention" that his ex-girlfriend "never took care of our side of the [ski] trip" and asking Defendant Kelley to let him know if the amount of the check was not enough to cover the expenses.

68.     All of these efforts were a deliberate attempt by Defendants Kang and Kelley to cover-up their scheme from NYSCRF and others.

69.     On February 22, 2016, the NYSCRF terminated Defendant Kang.

70.     On April 21, 2016, Defendant Kang provided sworn testimony to the Commission, during which he perjured himself throughout.

71.     In August 2016, Defendant Kang met with Defendant Schonhorn.  During this

meeting, Defendant Kang discussed how to thwart the Commission's investigation and any criminal investigation into the activities of Defendants Kang and Schonhorn.

72.     Also at this meeting, Defendant Kang returned the $17,400 Panerai watch to Defendant Schonhorn.  Defendant Kang told Schonhorn that he had shredded the paperwork that had come with the watch, and he explained to Defendant Schonhorn how to have Defendant Kang's name removed from the watch company's registration records.

73.     Defendant Kang also disclosed to Defendant Schonhorn the substance of his testimony to the Commission, and coached Defendant Schonhorn to frustrate the Commission's attempts to question Defendant Schonhorn by simply saying that he does not recall things. Defendant Kang also suggested to Defendant Schonhorn that they purchase disposable cellphones in order to further discuss their attempts to cover up their activities without the risk of their telephone calls being monitored.

## Claims for Relief

### Count I

### *Against Defendant Navnoor S. Kang*
### *for Violations of Section 10(b) of the Exchange Act*
### *and Rule 10b-5 Thereunder*

74.     The Commission realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

75.     Defendant Kang, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts,

practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective purchasers of securities.

76.     Defendant Kang knowingly or recklessly engaged in the fraudulent conduct described above.

77.     By engaging in the conduct described above, Defendant Kang has violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Count II

### *Against Defendant Navnoor S. Kang*
### *for Violations of Sections 17(a) of the Securities Act*

78.     The Commission realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

79.     Defendant Kang, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

80.     Defendant Kang knowingly, recklessly, or negligently engaged in the fraudulent conduct described above.

81.     By engaging in the conduct described above, Defendant Kang violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**Count III**

***Against Defendants Gregg Z. Schonhorn and Deborah D. Kelley***
***for Violations of Section 10(b) of the Exchange Act***
***and Rule 10b-5(a) and (c) Thereunder***

82.     The Commission realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

83.     Defendants Schonhorn and Kelley, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective purchasers of securities.

84.     Defendants Schonhorn and Kelley knowingly or recklessly engaged in the fraudulent conduct described above.

85.     By engaging in the conduct described above, Defendants Schonhorn and Kelley violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

**Count IV**

***Against Defendants Gregg Z. Schonhorn and Deborah D. Kelley***
***for Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act***

86.     The Commission realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

87.     Defendants Schonhorn and Kelley, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in transactions, practices, or courses of business which operated or would operate as a

fraud or deceit upon purchasers of securities.

88.    Defendants Schonhorn and Kelley intentionally or recklessly engaged in the fraudulent conduct described in paragraph 88(a) and intentionally, recklessly, or negligently engaged in the conduct described in paragraph 88(b).

89.    By engaging in the conduct described above, Defendants Schonhorn and Kelley violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

**Count V**

***Against Defendants Gregg Z. Schonhorn and Deborah D. Kelley
for Aiding and Abetting Violations of Section 10(b) of the Exchange Act
And Rule 10b-5(b) Thereunder***

90.    The Commission realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

91.    By engaging in the conduct described above, Defendant Kang, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails, directly or indirectly, acting intentionally, knowingly or recklessly, made untrue statements of material fact or omitted to state material fact(s) necessary to make statements made, in light of the circumstances under which they were made, not misleading.

92.    Defendants Schonhorn and Kelley knowingly or recklessly provided substantial assistance to Defendant Kang in his violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

93.    By engaging in the conduct described above, Defendants Schonhorn and Kelley aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

18

**Count VI**

*Against Defendants Gregg Z. Schonhorn and Deborah D. Kelley*
*for Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act*

94.     The Commission realleges and incorporates by reference paragraphs 1 through 73

as if fully set forth herein.

95.     By engaging in the conduct described above, Defendant Kang, in the offer or sale

of securities, by use of the means or instruments of transportation or communication in interstate

commerce or by the use of the mails, directly or indirectly, obtained money or property by means

of untrue statements of material fact or omissions to state a material fact necessary to make the

statements made, in light of the circumstances under which they were made, not misleading.

96.     Defendants Schonhorn and Kelley knowingly or recklessly provided substantial

assistance to Defendant Kang in his violation of Section 17(a)(2) of the Securities Act.

97.     By engaging in the conduct described above, Defendant Schonhorn and Kelley

aided and abetted violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)].

**Prayer for Relief**

**WHEREFORE,** the Commission respectfully requests that the Court:

**I.**

Permanently enjoin Defendants from violating or aiding and abetting violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

**II.**

Order Defendants to disgorge the ill-gotten gains they received from the violations

alleged herein, including prejudgment interest thereon;

**III.**

19

Order Defendants to pay civil penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and

**IV.**

Grant such other and further relief as the Court deems just and proper.

**Jury Demand**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

Date:   December 21, 2016

Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

/s/ Alyssa A. Qualls
Alyssa A. Qualls (AQ-4247)
John E. Birkenheier, Illinois Bar No. 6270993
Brian D. Fagel, Illinois Bar No. 6224886
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
  Chicago Regional Office
175 West Jackson Blvd., Suite 900
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
QuallsA@sec.gov
BirkenheierJ@sec.gov
FagelB@sec.gov